UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN THE MATTER OF                          *         CIVIL ACTION
MARQUETTE TRANSPORTATION COMPANY, LLC,
AS OWNER AND OPERATOR OF THE TOWING VESSEL
MISS KATIE, PETITIONING FOR EXONERATION   *         NO. 12-1448
FROM OR LIMITATION OF LIABILITY


                                          *         SECTION "F"

<u>ORDER AND REASONS</u>

Before the Court is Claimant Great Lakes Dredge & Dock
Company, LLC's Rule 12(b)(1) motion to dismiss the limitation
complaint.  For the reasons that follow, the motion is GRANTED.

**Background**

The events giving rise to this Limitation of Liability Act
proceeding, which was instituted by Marquette Transportation
Company, LLC, as owner and operator of the towing vessel, MISS
KATIE, are as follows:

On January 20, 2011 Great Lakes Dredge & Dock Co., LLC's
dredge TEXAS ran aground in the Brownsville Ship Channel while
under the tow of Marquette's tug MISS KATIE.  For 17 days, from
January 31 to February 16, the TEXAS was out of commission while it
was being repaired at Bollinger Shipyard.  On February 18, 2011
Marquette's Claims Manager, Ronnie Dupuy, emailed GLDD Claims
Manager, Rick Lietz, asking: "Do you have an invoice from Bollinger
[Shipyard] or an estimated repair costs? Also, any estimate of

other costs unrelated to repairs?"  Thereafter, on February 24, 2011 Lietz wrote[1] to Dupuy:

> Re:  Dredge TEXAS
>      Grounding incident at Brownsville, Texas
>
> Dear Mr. Dupuy:
>
> Great Lakes Dredge & Dock Company is the owner and operator of the DREDGE TEXAS.  On January 16, 2011 the Dredge sustained substantial damages as a result of running aground while being towed by Marquette's Tug, the M/V MISS KATIE.  The grounding and resulting damages to the TEXAS were caused by the negligence of the crew of the MISS KATIE.  Accordingly, [GLDD] confirms its intention to hold Marquette Transportation responsible for not only the physical damages sustained by the TEXAS, but also the consequential damages sustained by [GLDD] as a result of the accident.
>
> As a result of the necessary drydocking of the DREDGE TEXAS, Bollinger Shipyard has invoiced GLDD $648,420.06, of which 636,970.06 is for permanent repairs directly related to the casualty (see copy of invoice attached).  The repairs were necessary to regain class certification and return the Dredge to service as quickly as reasonably possible in order to mitigate consequential losses.  This casualty has placed an enormous financial burden on GLDD, and one that Marquette Transportation would eventually have to compensate GLDD for, should the matter proceed to litigation.  In an effort to avoid time delays and associated costs and to streamline the resolution of GLDD's claim, GLDD requests that Marquette pay the above referenced repair costs now, on a without-prejudice basis.  Marquette's payment would go a long way towards reducing GLDD's losses and maintaining the trust and confidence GLDD has placed in Marquette over many years of doing business together.
>
> GLDD's request is based on our view of a clear case of Marquette's responsibility for the incident.  To put the request in perspective, we summarize only a few of the pertinent facts.

--------

[1]Lietz emailed Dupuy a letter, a copy of Bollinger Shipyards invoice, and a draft Partial Release.

The TEXAS left Morgan City under tow of
Marquette's tug MISS KATIE on January 16,
2011.  On January 20, 2011, when the tow was a
few miles North of the entrance to the
Brownsville Ship Channel, Marquette's assist
tug, the CONNOR, left the inlet to go meet the
tow.  Seas were rough, a cold front was
blowing in, and Captain Bouvier's subsequent
statement to the Coast Guard suggests the wind
speed was 50-60 mph.

Meanwhile, the MISS KATIE's Captain advised
that conditions were "a little choppy", but he
was going to enter the channel as long as he
had light.  In fact, it was more than a little
choppy the tide was coming in, seas were
heavy, and according to MISS KATIE's Captian's
own statement to the Coast Guard, winds were
blowing 45-50 mph.  Entry into the channel
should have never been attempted under those
conditions without a clear plan to include the
proper direction of approach and the
coordination of the available assist tugs.

As it neared the Brownsville channel, the MISS
KATIE shortened the towline, but it was still
several hundred feet in length, which was too
long for anything but a straight-on approach
to the channel under the existing conditions.
After the MISS KATIE made its turn into the
channel, the TEXAS continued to drift to the
south, causing her to allide with the tip of
the granite-rock jetties that define the
inlet.  Assist tugs were needed to pull the
dredge from her grounded position.

During the final leg of the trip, there was
inadequate communication between the Captain
of the MISS KATIE and Marquette's other tug,
the CONNOR.  But at a minimum, the MISS
KATIE's Captain should have notified the
CONNOR of the approach he intended to take
into the channel and ordered the CONNOR to
shadow the Dredge in an appropriate position
in the event of a problem.  The MISS KATIE's
Captain failed to take appropriate actions
under the circumstances to avoid the
subsequent grounding of the TEXAS, including

his improper choice of approach and tow line length, as well as inadequate co-ordination with his assist Tug. Because the MISS KATIE and CONNOR were not in position to prevent or stop the chain of events, and because the MISS KATIE failed to take appropriate steps under the circumstances, the Dredge came into contact with the jetty, thereby sustaining extensive damages to the hull.

The above is meant to be a summary only and is set forth for the purpose of facilitating the ultimate compromise and settlement of claims which may be asserted by GLDD against Marquette. As the initial part of that process, GLDD requests that Marquette pay the damage repair related portion of the Bollinger Shipyard invoice without prejudice to any rights and defenses Marquette may assert as the claim process moves forward. Paying the repair invoice now will significantly mitigate GLDD's damages, eliminate any future claim for interest, and hopefully enable the parties to eventually resolve the remainder of the claim without the need for costly and time consuming litigation.

As you can see, I've taken the liberty of enclosing a draft Partial Release document for your review and consideration....

When he received the letter, invoice, and partial release, Dupuy reviewed these items, raised some questions, negotiated with Bollinger, and then sent Bollinger a check on April 5, 2011 for $626,970.06.

Later, GLDD sent Marquette a package of additional invoices for related costs, including survey fees and transportation costs associated with repair, totaling $155,083.16. On June 22, 2011, Dupuy of Marquette wrote to Lietz of GLDD:

Sorry for the late response. Took a while for our surveyor to get back to me. The items marked "no invoice" did not have supports. Could you check on this and forward. Also, there is an invoice from Gulf Towing

> $85,310.71 that doesn't match up. There is also an
> invoice from Marquette for $4,371.43 for (Medical)??
> Please clarify. We look forward to resolving this claim
> as soon as possible.
> Will there be any more expenses? Matt Yacavone expressed
> his interest in settling the remaining claim rather than
> piece meal. Is that possible? Look forward to your
> reply.

And again on June 27, 2011, after Marquette had completed its

review of the supplemental invoices, Dupuy wrote to Lietz:

> We have completed review of the supplemental invoices and
> find them in order. However, we would like to settle
> this matter in final and was wondering whether you were
> in a position to submit a final claim? Please let me
> know if this is possible?

Dupuy received no response. Almost two months later, on August 25,

2011 Marquette met GLDD at its office in Chicago, at which time

GLDD discussed its losses arising from the January 20 grounding; in

particular, GLDD explained the impact that the grounding had on its

dredging operations: GLDD explained to Marquette that the TEXAS was

contractually committed to work at the time of the grounding, and

in order to meet this commitment, GLDD had to deploy other assets

while the TEXAS was being repaired. As a result, GLDD advised

Marquette, GLDD anticipated its losses, excluding the amounts that

Marquette had already paid, were at least $2.3 million. Marquette

does not dispute that these discussions were had on August 25;

however, Marquette suggests that "Great Lakes indicated an economic

claim would be coming, but nothing was received until December 7,

2011."

On December 7, 2011 GLDD, through its President of Dredging Operations, wrote Marquette, transmitting GLDD's "economic impact claim"; GLDD proposed that Marquette pay certain delay costs, towing costs, depreciation, fixed maintenance, marine insurance, overhead costs, and profits, which altogether total $4,725,080.[2]

Six months after receipt of the December 7 letter and supporting materials, on June 6, 2012, Marquette filed its verified complaint for exoneration from or limitation of liability; thereafter, Marquette posted a bond for the limitation fund in the amount of $2,100,000 (the alleged value of the MISS KATIE and her pending freight), and the Court granted its request to issue an order directing the issuance of notice to claimants and restraining prosecution of claims.

GLDD now requests dismissal of Marquette's limitation proceeding as untimely, thus challenging this Court's subject matter jurisdiction.

I.

Motions filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure allow a party to challenge the Court's subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1).

The burden of proof for a Rule 12(b)(1) motion to dismiss is

---

[2]GLDD's economic impact claim was transmitted by letter and accompanied by a confidentiality agreement and 40-pages of "impact cost analysis and supporting documentation" that was stamped "CONFIDENTIAL AND PROPRIETARY".

on the party asserting jurisdiction. <u>Budget Prepary, Inc. v. AT&T</u> <u>Corp.</u>, 605 F.3d 273, 278 (5th Cir. 2010)(citing <u>Ramming v. United</u> <u>States</u>, 281 F.3d 158, 161 (5th Cir. 2001)).  The Court may find a plausible set of facts to support subject matter jurisdiction by considering any of the following: "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."  <u>Barrera-Montenegro v.</u> <u>United States</u>, 74 F.3d 657, 659 (5th Cir. 1996).

The standard of review applicable to motions to dismiss under Rule 12(b)(1) is similar to that applicable to motions to dismiss under Rule 12(b)(6).  <u>See</u> <u>Williams v. Wynne</u>, 533 F.3d 360, 364-65 n.2 (5th Cir. 2008)(observing that the Rule 12(b)(1) and Rule 12(b)(6) standards are similar, but noting that applying the Rule 12(b)(1) standard permits the Court to consider a broader range of materials in resolving the motion).[3]

Rule 12(b)(6) allows a party to move for dismissal of a complaint when the plaintiff has failed to state a claim upon which

---

[3]In deciding a Rule 12(b)(6) motion to dismiss, the Court may consider documents that are essentially "part of the pleadings" -- that is, any documents attached to or incorporated in the plaintiffs' complaint that are central to the plaintiffs' claim for relief.  <u>Causey v. Sewell Cadillac-Chevrolet, Inc.</u>, 394 F.3d 285, 288 (5th Cir. 2004) (citing <u>Collins v. Morgan Stanley Dean Witter</u>, 224 F.3d 496, 498-99 (5th Cir. 2000)).  Also, the Court is permitted to consider matters of public record and other matters subject to judicial notice without converting the motion into one for summary judgment.  <u>See</u> <u>United States ex rel. Willard v. Humana Health Plan</u> <u>of Texas Inc.</u>, 336 F.3d 375, 379 (5th Cir. 2003).

relief can be granted.  Such a motion "'is viewed with disfavor and is rarely granted.'"  See Lowrey v. Tex. A & M Univ. Sys., 117 F.3d 242, 247 (5th Cir. 1997) (quoting Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1050 (5th Cir. 1982)).

"'To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Gonzalez v. Kay, 577 F.3d 600, 603 (5th Cir. 2009) (quoting Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)) (internal quotation marks omitted).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 129 S. Ct. at 1940.  "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quotation marks, citations, and footnote omitted).

The United States Supreme Court suggests a "two-pronged approach" to determine whether a complaint states a plausible claim for relief.  Iqbal, 129 S. Ct. at 1950.  First, the Court must identify pleadings that are conclusory and thus not entitled to the assumption of truth.  Id.  A corollary: legal conclusions "must be supported by factual allegations."  Id.  Second, for those

pleadings that are more than merely conclusory, the Court assumes the veracity of those well-pleaded factual allegations and determines "whether they plausibly give rise to an entitlement to relief." Id.

This facial plausibility standard is met when the plaintiffs pleads facts that allow the Court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 1949. Claims that are merely conceivable will not survive a motion to dismiss; claims must be plausible. Twombley, 550 U.S. at 570; see also Iqbal, 129 S. Ct at 1949 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully"). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Iqbal 129 S. Ct. at 1949 (internal quotations omitted). In the end, evaluating a motion to dismiss is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950.

II.
A.

The Limitation of Shipowners' Liability Act allows a vessel owner to limit its liability to the value of its vessel (and pending freight). 46 U.S.C. § 30505. To secure this statutory benefit, the Act requires that vessel owners file their petition to

9

limit liability "within 6 months after a claimant gives the owner **written** notice of a claim." 46 U.S.C. § 30511(a)(emphasis added).[4] "The purpose of the six-month prescription on the limitation of liability petition is to require the shipowner to act promptly to gain the benefit of the statutory right to limit liability." <u>Exxon Shipping Co. v. Cailleteau</u>, 869 F.2d 843, 846 (5th Cir. 1989). The Act's six-month filing requirement is a mandatory, jurisdictional requirement; "[i]f the action is not filed within that six-month period, it is dismissed as untimely." <u>In re Eckstein Marine Service, LLC</u>, 672 F.3d 310, 314-15 (5th Cir. 2012)(citation omitted); <u>Complaint of Tom-Mac, Inc.</u>, 76 F.3d 678, 682 (5th Cir. 1996)("In their motion to dismiss, Claimants asserted that Tom-Mac's limitation of liability action was not timely filed, thus

---

[4]46 U.S.C. § 30511(a) provides:

> The owner of a vessel may bring a civil action in a district court of the United States for limitation of liability under this chapter. The action must be brought within 6 months after a claimant gives the owner written notice of a claim.

Rule F(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure reinforces § 30511(a):

> (1) Time for Filing Complaint; Security. Not later than six months after receipt of a claim **in writing**, any vessel owner may file a complaint in the appropriate district court...for limitation of liability pursuant to statute ....

Fed.R.Civ.P. Supp. F(1)(emphasis added).

challenging the district court's jurisdiction to hear Tom-Mac's petition.").

"The Limitation Act's six-month timeline," the Fifth Circuit has observed, "is triggered only if and when the written notice reveals a 'reasonable probability' that the claim will exceed the value of the vessel, and therefore that the vessel owner might benefit from the Limitation Act's protection." In re Eckstein Marine Service, LLC, 672 F.3d at 317 (noting that "[t]he Limitation Act's six-month timeline does not automatically begin to run when a vessel owner learns a claimant has filed a lawsuit."). The Fifth Circuit has instructed that the "reasonable possibility" standard:

> is not toothless [but] it is also not particularly stringent. Once a reasonable possibility has been raised, it becomes the vessel owner's responsibility to initiate a prompt investigation and determine whether to file a limitation action. The Limitation Act provides generous statutory protection to the vessel owners who reap all of its benefits. When there is uncertainty as to whether a claim will exceed the vessel's value, the reasonable possibility standard places the risk and burdens associated with that risk on the owner. In other words, if "doubt exists as to the total amount of the claims or as to whether they will exceed the value of the ship the owner will not be excused from satisfying the statutory time bar since he may institute a limitation proceeding even when the total amount claimed is uncertain."

Id. at 317-18 (citations omitted). To determine whether a written notice reveals a "reasonable possibility" that a claim will exceed the value of the vessel, the Court is instructed to "engage in a fact-intensive inquiry into the circumstances of the case." Id. at 317 (citation omitted).

*B.*

When did GLDD first provide written notice that revealed a reasonable possibility that its claim would exceed the value of the MISS KATIE? If it was December 7, 2011, then the Limitation action was timely filed. If, however, it was much earlier (on February 24, 2001), then the Limitation action must be dismissed for lack of subject matter jurisdiction and the stay order must be dissolved. To resolve which of these writings revealed a reasonable possibility that GLDD's claim would exceed the value of the MISS KATIE, the Court's fact-intensive inquiry is advanced by reiterating these significant facts, in context:

- After the casualty, the dredge TEXAS was out of commission undergoing repairs for 17 days.
- Shortly after the TEXAS was repaired, on February 24, 2011, GLDD wrote to Marquette, seeking reimbursement for the invoiced repairs of $636,970.06.
- In seeking payment for the invoiced repairs, GLDD suggested in its February 24 correspondence that it intended to hold Marquette liable for the physical damages "but also the consequential damages" resulting from the accident. GLDD characterized the casualty as placing "an enormous financial burden on GLDD" but noted that, if Marquette paid the repair costs, this "would go a long way towards reducing GLDD's losses" and also that paying the repair invoice "will significantly mitigate GLDD's damages, eliminate any future claim for interest, and hopefully enable the parties to...resolve the remainder of the claim without the need for...litigation."
- Marquette paid invoiced repair costs to Bollinger, totaling $626,970.06 on April 5, 2011.
- When GLDD asked Marquette to pay additional repair related costs totaling $155,083.16, Marquette twice asked whether there would be "any more expenses", asking GLDD "whether [it was] in a position to submit a final claim"; Marquette wanted to "settl[e] the remaining claim rather than piecemeal." But GLDD did not respond to Marquette's requests regarding what amount would resolve GLDD's claim in full.

12

- Two months after Marquette's request to settle GLDD's claim in full, the parties met at GLDD's offices, where GLDD told Marquette that GLDD's remaining losses exceeded $2.3 million.
- More than three months after the meeting at GLDD's offices, on December 7, GLDD submitted its written economic impact claim and supporting documentation in which its remaining damages were alleged to exceed $4 million.
- The MISS KATIE is worth at least $2.1 million; the physical damage to the TEXAS was less than half the value of the MISS KATIE.
- GLDD seeks to recover for its economic losses (not repair costs, which have already been paid).
- GLDD has not filed a lawsuit against Marquette.
- Unlike most of the case literature relevant to the timeliness of limitation complaints, GLDD has not filed a lawsuit and no personal injuries are alleged.

Marquette contends that, considering these facts, the first written notice that revealed a reasonable possibility that GLDD's claim would exceed the value of the MISS KATIE was December 7. The February 24 letter, Marquette insists, focused on the physical damage and repair to the TEXAS and even suggested that, once Marquette paid those invoiced amounts, this "would go a long way towards reducing GLDD's losses" and "will significantly mitigate GLDD's damages." This writing could not have triggered the six-month filing period for its limitation complaint, Marquette contends, because it failed to reveal a reasonable possibility that GLDD's remaining claim for consequential damages during the 17 day repair period for the TEXAS exceeded $2.1 million value of the MISS KATIE. And, Marquette insists, after receipt of the February 24 correspondence, it attempted (to no avail) to pin down GLDD to reveal a number that would fully resolve its claim against it.

GLDD counters that its February 24 correspondence clearly

revealed GLDD's intent to recover from Marquette its consequential losses and revealed that the casualty had "placed an enormous financial burden on GLDD." This, and its unmistakable position that Marquette was liable for its losses, GLDD insists, was sufficient to trigger the six-month filing deadline for limitation proceedings, especially considering that the reasonable possibility standard is construed against the vessel owner. The Court agrees.

Although the Court acknowledges that the at-times diplomatic tone of the February 24 letter could be construed as leaving open the potential amount of consequential damages in relation to repair-related costs GLDD would seek to recover,[5] and Marquette twice requested that GLDD quantify the non-repair-related damages, suggesting some attempt at investigation on its part, the Court finds that the February 24 letter triggered the six-month deadline for filing a limitation action. It is clear that "doubt exist[ed] as to the total amount of the claim[]" or whether GLDD's consequential damages claim would exceed the amount of the MISS KATIE such that Marquette is "not excused from satisfying the statutory time bar"; it could have instituted a limitation proceeding even in the face of the uncertainty created by the February 24 letter. See Eckstein Marine, 672 F.3d at 317-18.

---

[5]The letter states that the casualty placed an "enormous financial burden on GLDD" but then states that paying the repair costs (less than half of the value of the MISS KATIE) would "go a long way towards reducing GLDD's losses".

Because there was uncertainty as to whether GLDD's claim, as revealed in the February 24 letter, would ultimately exceed $2.1, the reasonable possibility standard requires that Marquette bear the burden of that risk. <u>See</u> <u>id.</u> The fact that Marquette's complaint was filed 16 months after this first written notice renders the complaint untimely and divests this Court of jurisdiction over the limitation proceeding.[6]

Accordingly, GLDD's Rule 12(b)(1) motion is GRANTED. Marquette's limitation complaint is hereby dismissed, and the Order directing the issuance of notice to claimants and restraining

---

[6]The Court is not unsympathetic to Marquette's frustration, in particular its invocation of dicta in <u>In re Morania Barge No. 190</u>, 690 F.2d 32, 34 (2d Cir. 1982)(noting "it is...reasonable to require [the vessel owner] to make the claimant define his position. If the claimant refuses to do so, it may be that the period does not begin to run until he does; we need not decide that, because in the case at bar the owner made no attempt of any kind to force the claimant to make his position clear...."). But when a vessel owner is in doubt as to the amount of a claim in relation to the value of its vessel, the Act, Supplemental Rule F(1), and the Fifth Circuit demand that Marquette file its limitation complaint within six months of any writing revealing a reasonable possibility that a claim exceeds the vessel's value. Marquette concedes that neither the Act nor cases interpreting it require a clear and unmistakable statement of damages exceeding the value of the vessel to trigger the six month filing period. However, Marquette suggests that it could not have known from the February 24 letter that GLDD would "attempt to assert a [multimillion dollar] far-reaching and unreasonable 'economic impact' claim", especially when GLDD had not finally quantified its alleged consequential damages at that time. But knowledge is not the standard; reasonable possibility is, and it is "not particularly stringent". If GLDD's $4,725,080 economic impact claim proves to be as "unreasonable" as Marquette suggests it to be, then ultimately GLDD will not be permitted to recover the full amount claimed. But the merits of GLDD's quantified consequential damages claim is not before the Court.

prosecution of claims is hereby dissolved.

New Orleans, Louisiana, October 24, 2012

_____

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE